TOWNSHIP OF DEPTFORD, PLAINTIFF-APPELLANT, v. WOODBURY TERRACE SEWERAGE CORPORATION, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 8, 1968—Decided June 21, 1968.

Before Judges GAULKIN, LEWIS and KOLOVSKY.

*Mr. Alfred T. Sanderson* argued the cause for appellant.

*Mr. Sidney M. Schreiber* argued the cause for respondent (*Messrs. Schreiber & Lancaster,* attorneys).

The Board of Public Utility Commissioners filed a brief *amicus curiae* (*Mr. William Gural,* Deputy Attorney General, on the brief; *Mr. Arthur J. Sills,* Attorney General, attorney).

The opinion of the court was delivered by

GAULKIN, S. J. A. D.    The township sued for specific performance of defendant's agreement to sell to the township certain of its property, its sewerage system "and all rights, privileges and franchises in and pertaining to the tract." The Chancery Division held that the contract was invalid because it had not been approved by the Public Utility Commission (hereafter P. U. C.) and dismissed the complaint. The township appeals. At our request, the P.U.C. filed a brief *amicus curiae.*

The agreement was stated as a condition upon which the township, on August 8, 1955, granted to defendant (pursuant to *R. S.* 48:13–3, since repealed) the township's consent that defendant corporation be organized and that it "construct and operate a sewage disposal plant and system" in an area of the township known as Woodbury Terrace which was being developed by the organizers of defendant corporation.

*R. S.* 48:13–6 (repealed *L.* 1962, *c.* 198) provided that:

"The corporate authorities of the municipality may, by ordinance, provide that such consent shall be conditioned upon the payment to the municipality of a specified sum of money, or upon quarterly, semiannual or annual payment to the municipality of specified sums of money or a specified percentage of the gross receipts of the company. *The corporate authorities shall annex to this consent any other terms and conditions upon which such consent is granted.*" (emphasis added)

*R. S.* 48:13–4 provided (until it was repealed by *L.* 1967, *c.* 156) that "The filing of the certificate of incorporation together with the consent of the municipality and the terms and conditions upon which the consent is granted, shall be

conclusive evidence that the company has assented to such terms and conditions, and the same shall be binding upon the company, its succesors and assigns."

The ordinance (which reenacted an earlier ordinance containing the same conditions for reasons stated *infra*) recited that the consent was "expressly conditioned upon the following":

"* 　 * 　 * 　 * 　 * 　 * 　 * 　 *

b. That the Woodbury Terrace Sewerage Corp. by acceptance of this consent makes an irrevocable continuing and unlimited offer to the Township of Deptford to sell, bargain, transfer and assign to the Township of Deptford, or its successors, all mains. meters, plants and pumping station and all and any other physical equipment of its sewerage system and all rights, privileges and franchises in and pertaining to the tract, for which consent is now given, for the sum of EIGHTY THOUSAND DOLLARS ($80,000.00) or a sum equal to the cost of the sewerage plant excluding the cost of mains, whichever sum is less; deducting nevertheless a sum equal to one-sixteenth (1/16) of the purchase price, as above provided, for each complete year of operation following the date when the said corporation commences operation of any part of the system, and for the sum of ONE DOLLAR ($1.00) at any time after the expiration of sixteen years from the date when the corporation commences operation of any part of the system. It is mutually agreed that upon the adoption by the Township of Deptford of an ordinance accepting the above offer, the Woodbury Terrace Sewerage Corp., shall forthwith without fraud or delay, sell bargain, transfer and assign the said facilities to the Township of Deptford for the agreed price as herein provided.

The title to be sold to the Township of Deptford for the price as above shall be free and clear of all charges, debts, liens, mortgages, bonds or other encumbrances or obligations whatsoever of the Woodbury Terrace Sewerage Corp. and the said utility company shall not in any way encumber or allow to be encumbered any of the facilities of the company upon which the Township may exercise its option, provided however, that the Woodbury Terrace Sewerage Corp. may encumber the plant and system in an amount not exceeding at any time that sum for which the Township may purchase the facilities as provided heretofore.

c. That the installation and construction of all mains, meters, plants and pumping stations and all and any other physical equipment and any additions, extensions or replacements thereof shall be installed under the direction and supervision of the township engineer."

Defendant admits that it sought this consent and agreed to its terms. The record of the hearings before the P.U.C. on April 25, 1955 and December 17, 1957 shows that the organizers of defendant corporation (hereafter "developers") were developing a large tract of vacant land in Deptford, bordering on the Borough of Westville, for the construction of about 250 one-family homes. The developers had expected to get water and sewerage from Westville but, as Kapnek, one of the developers, testified:

"* * * at the time that we were ready to start to hook into their sewerage system they decided that they were not going to honor that contract and they wouldn't supply us with sewerage, so it was a matter of going to Court and trying to enforce the contract [with Westville] or building our own sewerage utility, and at that time, as I say, we had built several sample houses and certain sales had been made based upon the fact that we had a sewerage contract with the Borough of Westville, so we had no choice but to go ahead and try to establish a sewerage utility of our own, and that led into our negotiations with the Township of Deptford and the final granting of this consent, and as I say, as far as we were concerned, we felt that we were forced to accept the conditions that they laid down * * *."

Deptford apparently had no sewerage facilities at that time, other than individual septic tanks. Since, as Kapnek said, the developers had sold and were selling lots on the representation that sewerage disposal would be provided for by means other than individual septic tanks, the developers were compelled to build their own sewer plant to service the development. Defendant was created to service only the area being developed by the developers. Mr. Kapnek testified:

"Q. What interest has the Whitney Home Builders—you designate yourself as Secretary-Treasurer of that company—what interest do they have in this particular transaction, if any?
A. Well, they have the interest that they are building the homes to be served by this sewerage plant.
Q. Well, the Westville Gardens Corporation is designated in this agreement for the sale of the land. Are they the owners of this tract?

A. They are the owners of part of the ground. A good bit of the ground has been conveyed to the Whitney Home Builders.

Q. Is any part of the ground that is being used for this sewerage system owned by the Whitney Home Builders?

A. Well, let me understand more clearly just what you are referring to. The system, as I understand it, designates the piping and mains; the plant designates the plant itself. *Now, the ground that the plant is on is owned by the Westville Gardens Corporation. The system, the mains, that ground is in the bed of the streets and is, of course, dedicated to the Township.*

\*          \*          \*          \*          \*          \*          \*          \*

Q. Then what interest does the Whitney Home Builders have in any part of this sewerage system, other than the fact that they built the houses that are going to be served by the plant?

A. Well, the Whitney Home Builders, together with the Westville Gardens Corporation, financed the building of the system and will sell the system to the Woodbury Terrace Sewerage Corp., with the Board's approval.

Q. *Other than Lots Nos. 1, 2 and 3 in Block 57, Section 1, and Lots Nos. 29, 30, 31 and 32 in Block 45, Section 2, on the Woodbury Terrace map, there is no part of this sewer system on any other part of that map, is there, other than in the bed of the streets?*

A. *No sir."* (Emphasis added)

On June 14, 1955 the P.U.C. hearing examiner reported his tentative approval of the franchise (with its conditions), subject to the correction of two technical defects in the original Deptford ordinance which had granted it. On August 8, 1955 Deptford passed another ordinance which repeated the conditions but corrected those defects. On October 13, 1955, the P.U.C. adopted the examiner's report and approved the franchise as granted by the township.

Defendant thereupon took title to the sewerage plant and facilities at a book value (arrived at by the accountant who served defendant as well as developers' "allied companies") of $91,374. The basis of that cost, the accountant said, was "the actual land cost, based upon a per footage basis, and * * * the cost of constructed plant and system."

The developers went ahead with the construction of houses and appeared quite content with their bargain until 1957, when the P.U.C. wrote defendant as follows:

"Your 1955 Annual report to the Board discloses that in accruing the annual depreciation charge to operations a rate of 6 2/3% equivalent to a fifteen year life expectancy for depreciable property was used. Studies by the Board have indicated that a life expectancy of between forty and fifty years for the type of plant and equipment used by you is normal. The board, therefore, questions the propriety of an annual charge for depreciation of 6 2/3%. The Board's staff suggests that the annual charge be corrected to reflect only the depreciation applicable to normal life expectancy of depreciable property, in conformity with the practice usually approved by the Board.

\*    \*    \*    \*    \*    \*    \*    \*

*If it is your desire to amortize by charges to the Surplus Account, the investment in plant not recovered by normal depreciation over the period covered by the mandatory offer for sale included in the franchise or municipal consent, there appears to be no objection to such procedure."* (Emphasis added)

By this time over 100 houses had been built and were being sewered by defendant. Defendant argued to the P.U.C. that it should be permitted to charge the users a rate which reflected 6–2/3% annual depreciation. When the P.U.C. refused to allow this, defendant filed a petition with the P.U.C. in September 1967, saying in part that:

"The right of the Township of Deptford to acquire such property is merely optional and if not exercised, after sixteen years, petitioner would have written off its property and be obliged to continue to render service to its customers at cost and without any return.

Petitioner commenced operations of its sewerage system in the year 1955 and in its accounting procedure began to accrue annual depreciation on the basis of one-sixteenth of the cost of depreciable property in order to be consistent with the provisions of the Ordinance of the Township of Deptford as aforesaid. Said annual rate of depreciation, if not applied to petitioner's operations and recovered from customer rates, would be contrary to the interests of its investors who are holders of the capital stock of your petitioner which was duly authorized to be issued by this Board \* \* \*.

By letter of this Board addressed to your petitioner dated March 25, 1957 \* \* \* [it] is \* \* \* indicated \* \* \* that the annual charge be corrected to reflect only the depreciation applicable to the normal life expectancy of depreciable property *and that the difference in such amount and the amount required by the Ordinance of the Township of Deptford be charged to the Surplus Account.* As above stated, such an accounting procedure would be contrary to the interests of stockholders and would impair the common stock of your petitioner in the hands of the holders thereof." (Emphasis added)

Defendant complained in its petition that in later cases before the P.U.C., the P.U.C. "expressly refrained from passing" on option provisions such as the one here involved. The petition concluded by asking that the P.U.C. fix the rate of depreciation and that it amend its "Certificate * * * approving the Ordinance of the Township of Deptford by revoking the approval" of the option.

The township was given notice of the petition but did not appear before the P.U.C. Following a hearing before an examiner, the P.U.C. on March 26, 1958 ordered:

"1. That our Decision dated October 13, 1955 in Docket No. 8313, 'Approval of Franchise' is hereby amended so as to include the statement:
'This Certificate is not to be construed, under any circumstances, as a ruling upon Paragraph 2-b of the Ordinance with respect to the acquisition of the utility properties by the Township of Deptford.'
2. The Company shall use the rate of 2¼% per year and a life of 40 years with regard to the depreciation factors related to its accounting for depreciation."

The township took the position, upon its complaint for specific performance, that the P.U.C. had not, by the amendment, declared the option condition void, but merely had said it neither approved or disapproved it. This, says the township, was a proper position for the P.U.C. to take because the P.U.C. has no jurisdiction to approve or disapprove a sale by a utility to a municipality, *N. J. S. A.* 48:3-7, and therefore it had no jurisdiction to approve the option originally or to disapprove it thereafter. Hence, says the township, the Chancery Division should have dealt with the option as a contract beyond the jurisdiction of the P.U.C. and enforced it. But the trial judge disagreed. He held that "without Board approval, the ordinance is ineffective. Likewise when the Board refuses to approve a section of the ordinance, that section is ineffective." He concluded that the March 26, 1958 order had effectively withdrawn the original approval and therefore the option was unenforceable.

Since *R. S.* 48:13 has been repealed, it would serve no useful purpose to investigate its meaning beyond what is essential for the decision of the case at bar, especially since unnecessary speculation by us might affect other corporations organized thereunder. Therefore, we deem it sufficient to say that the P.U.C. of course had the right to disapprove *in toto* a sewerage franchise granted under *R. S.* 48:13 if it found that a purchase clause therein made doubtful the corporation's ability to serve the claimed public need, but we doubt (but do not decide) whether, in face of *N. J. S. A.* 48:3–7, the P.U.C. had the right to exscind a purchase clause from a consent and yet approve the franchise, especially without giving the municipality the opportunity to withdraw its consent or to make another agreement. And, if it had that right, we question whether the P.U.C., upon the facts before it in April 1955 when the approval of the original conditional consent was granted, would have been legally justified in exscinding the option instead of requiring defendant corporation to provide adequate financing. After all, defendant was a mere agency of the developers to enable them to sell lots and build one-family houses. Had the developers been compelled to install 250 septic tanks, it probably would have cost them almost as much as the plant which they built, and they doubtless sold their houses for more because of the sewage disposal system. The record does not reveal the negotiations with the township, or why the township asked for the option, but doubtless it was exacted by Deptford from defendant for the protection of the community against possible problems. The township probably did not wish to undertake to provide sewerage for the development under construction, and yet it wanted to protect itself against all future contingencies for the benefit of the public, including the purchasers from the developers, and to prepare for the time when the township might decide to provide for a municipally operated sewerage system. The developers got what they bargained for.

We limit our holding to the following: we hold that the order of March 26, 1958 amending the franchise was not a

disapproval of the option but a statement that the P.U.C. neither approved nor disapproved it. Further, assuming the P.U.C. had the power to approve or disapprove the option when it approved the franchise initially, and the right thereafter to amend its approval of the franchise in other respects, we hold that in face of *N. J. S. A.* 48:3–7 the P.U.C. had no authority to void the option after it had approved it, especially after more than two years had elapsed and over 100 houses had been connected to the system.

Defendant argues that the township is barred from now claiming the option because it took no appeal from the P.U.C.'s amendment of the approval. But that would be true only if the amendment voided the option, which we hold it did not.

For the foregoing reasons, the judgment is reversed and the case is remanded to the trial court for further proceedings not inconsistent with this opinion. However, we do not mean to pass upon defendant's other defenses, or to indicate that, if plaintiff prevails, it is necessarily entitled to the remedy of specific performance. The right to prevail, the remedy and all other incidental questions we leave to the trial court.

We do not retain jurisdiction. No costs.